All rise. Hear ye, hear ye, hear ye. This Honorable Appellate Court of the 2nd District is now open for submit to adjournment. The Honorable Catherine E. Zinoff is item. Thank you, Christmas Eve. Your Honor, this is the first case of the morning. Call 209-1024. Devin Arkin v. Robert F. Ball. On behalf of the Appalachians, Mr. Derek Price. On behalf of the Athenians, Mr. Mark A. Stang. Good morning, counsel. I apologize for the late start this morning. Mr. Price. Good morning, Your Honor, and may it please the Court. This case brings into high relief the distinction between collective enforcement of the corporate association's rights and an individual's enforcement of the individual's rights. And in this case, res judicata should not apply to an individual where the corporate collective action taken by the association is checked due to the corporate acts of that very association and not those of the individual, and not acts that individual control. Here, the Ground Lake-Meadow Lake Homeowners Association, Greater Woods-Meadow Lake Homeowners Association, brought an enforcement action as it's entitled to do under the Declaration, using the collective resources it has at its disposal. And it was checked in its ability to do that because, according to the defendants, it had waived all of its rights to do so by not doing anything since 1998. Arkin hadn't even lived in the subdivision until he moved in in 2003. So for res judicata to apply to Arkin to say that because the Homeowners Association couldn't go forward, therefore Arkin can't go forward, would be an inappropriate application of res judicata. Counsel, will you contrast for us the interest that your client asserted in the suit in 2008 and the interest that the association asserted in 2007 in that lawsuit and indicate how they are not the same? The underlying issue, swans do not comply with paragraph 16, that issue is the same enforcement issues. Paragraph 16 of the Declaration, those are the same. It's the ability to enforce. The corporation, the association with its collective resources, can't go forward because it apparently, according to the defendants, waived it, and it can't go forward because it didn't have the resources or the desire to do that. So the interest is in who has an interest in pursuing the actual enforcement. If the association was checked by its inaction and waiver, its interests are gone and different. There can never be collective action, and that's what the consent judgment says. There can never be collective action in the future. But why should that bar... I'm sorry, counsel, you're telling me that a body can preclude future bodies from actions and legislation. You're telling me or the panel that the association or the board couldn't pass an article that said that swans, Canada geese, feral pigs are public nuisances and private nuisances and are outlawed. Not under the terms of this Declaration, it cannot. It had required 80%, according to the terms of the Declaration, which creates the association. The only way that Declaration can be amended is with 80%, and they tried that, and it was defeated. They didn't get the 80% votes. So when we get to this consent judgment where they've raised the affirmative defense in the end of March... So you're talking about it as a practical matter, not as a theoretical matter. As an actual matter on these facts, not as a theoretical matter. My point is the way you were talking, it sounded like you were saying that actions of one body permanently bind other bodies in the future. I don't think that's the law. It may be a practical impossibility because of the 80% as opposed to a simple majority. But I just wanted to clarify that. If I may further, it's our position that this consent judgment is raised judicata to the association only. And that's in the Arnett case, cited by the defendants and cited by the appellees and discussed by us, where they say there is a distinction to be made on consent judgments about whether they are raised judicata to the parties to them or to other parties outside them. And that's what our point is about that consent judgment. It is raised judicata only to the association and its collective efforts, its ability to actually collect money from every homeowner association and bring those resources to bear. But the individuals can go forward because they are not the same. They could not be adequately represented by an association who, due to its inaction for eight years, or 10 years, could no longer go forward. Are you saying that's true as a matter of law, that they could never be raised judicata where the situation involves association and individual homeowners? Is that what you're saying? Not in all cases. In this case, it is the – and this is where the affirmative matter comes into play – it is the affirmative matters, those are all part of this transaction, that the association rested on its rights for 10 years. It's also in the particular wording of Judge McCoskey's order. He accepted their stipulation. And if you look at the Arnett case, it talks precisely about the difference between when a court accepts the agreement of a party – of parties to a consent agreement – and when it has finally adjudicated something. And Judge McCoskey struck those words. He did not adjudicate. He did not decree. He accepted their stipulation. And the Arnett case is very instructive on this. That says that creates a different kind of judgment, which is to those two parties is raised judicata, but were reluctant, the court said, reluctant to give any preclusive effect to it outside of that for those reasons. What about the other case, though, that seems to suggest that for purposes of raised judicata, a settlement agreement is a final judgment on the merits because any other interpretation would effectively nullify all settlements because it would be subject to that argument? Well, that's the general principle that they can be, but Arnett fleshes that out for us and says that's the general principle, but we have to look at consent judgments. It calls it a – logic dictates a distinction. That's the words they use when it will be given preclusive effect. So, yes, as between the association, no new board of the association, no newly elected board can come in and go, well, they didn't do it right. We'll try again with our collective resources to bring an enforcement. It's raised judicata to them. But to the individuals who have not had their day in court, so to speak, on this and who aren't adequately represented by an entity that's waived its rights before he ever moved in, he needs his chance to enforce a declaration that's on the books. Your argument has some appeal to it regarding the equities of the homeowner being subject to the association, but how do you answer the argument that really in the first lawsuit, the association had no independent interest in enforcing paragraph 16? As a matter of fact, they were very reluctant to get involved, but then they filed the suit at the urging of Arkin. So isn't there some argument of privity there? The privity gets started, I'll grant you that. But the declaration says that they have many remedies available to them. They could have fined the defendants. They could have leased their property. Bringing litigation is only one of many things, and all Arkin ever asked, according to the record, is please act. He didn't demand they sue. He didn't pick their lawyer. He, in fact, objected to their lawyer. So when we get going with the, you know, Arkin asked them to act, and yes, the association in the case, Justice McClain, that you did, the Rockford case, they're the union. It's the same sort of thing. The union asserted that particular police officer's rights as opposed to the union's rights. In fact, the opinion goes out of its way to say, here, we're asserting the very same rights that have already been adjudicated when the police officer lost himself the first time. The union came in to say, well, we're going to assert Stephen Johnson's rights, the same exact time. That's not what happened in this case. In this case, the association came in and said, we're asserting our rights, not Devin Arkin's rights. So we're not asserting any particular homeowner's rights. We're bringing, our collective action that we've decided is not fines, not liens, but a lawsuit. And so under the three elements, I don't think it's final because, you know, McCoskey deleted those things, and under the teaching of Arnett, there is a logical distinction. So as to others, like Arkin, it's not final. The identity of parties. The separation of conduct would be unstoppable. Well, that's the interesting part of that fourth district case we have, the non-for-profit case. Whether or not, you know, collateral falls into the same analysis. But Arnett, interestingly enough, goes further to say, even for those things, we're reluctant to give it any preclusive effect outside of the two parties because, A, we're not sure what it means, and two, we've accepted their agreement. It's not like we've gotten down to it. So if you look at that fourth district case that they cite about the non-profits and the insurance pool, that's essentially what it came down to. It was really a collateral, unstoppable decision, and there they've invoked the same sort of analysis. So then we, again, Arnett applies. Would it have been possible for the association to have settled it in such a way that they would have agreed not to seek an injunction but rather to find the perpetrator? That would have been possible, yes. That is about collective enforcement. We see this in environmental matters and in antitrust matters where the United States comes in and says, or housing matters, this is what we're going to do. Well, if that had happened, would your client then have been estopped by litigation because, in fact, they acted as you indicated your client wanted them to? Or is the fact that they act not necessarily some sort of estoppel on your client? It would not be estoppel if they find them and then they continued to do the violation. They brought the swans back, raised another set of babies, and sent them on their way. That's continuing the violation. So the fines weren't sufficient, and now he needs to bring his action to try and redress this violation of the declaration. I mean, that's very possible. They could have fined him, they would have paid him and gone on with the bad action, in this case the violation of paragraph 16. But wasn't the essence of the suit in 2007 and 2008 to enforce paragraph 16? And the association wanted, that was the reason they brought suit and that's the reason your client brought suit. That is true. Isn't it correct, though, that this current suit would be barred by race judicata not because of any waiver of the rights on the part of the association of your client? I mean, they didn't prevent your client from bringing suit, but because the claims really were the same. No, because it's not. To enforce this paragraph. The association is not an adequate representative, and that's the. And the adequacy, the lack of adequacy comes where in your mind? From the waiver. That they had waived their right to enforce. That they had, they were subject to, they were subject to five affirmative defenses. Lashes, waiver, ultra vires, and the board, the record shows the board said we can't go forward. But that consent judgment contained no waiver provision. Well, the consent judgment wasn't a stipulation between them that we'll allow these things to be. But to find race judicata, you have to have all three elements. And adequate representation is not possible. The association couldn't represent them when they said we're not ready to go forward and overcome this waiver argument. We are not prepared to do that. And if they did find that it was waived, yes, they brought the enforcement action. But at the court level, if they had waived their right to do so, they couldn't use the collected resources from every homeowner to do it? That means nobody can enforce it then? That would be what race judicata would stand for. So they entered into this settlement agreement where it resulted between those two parties. Fine. This association can never bring collective action. They can't ask anybody else in the subdivision for money to go after these swans. That's over. But the declaration makes a distinction. The association has a right of enforcement and so does every individual lot owner. That's what the declaration gives each one a right to do. And when the association bowed out collectively because it wasn't adequate to represent the individuals, said it didn't have the money, didn't want to overcome this waiver thing, and they've been doing it since 98, Arkin only lived there since 03, it's a very different fact pattern. And so that impacts both the adequacy of representation, which is the sine qua non of the parties' inquiry, and it impacts the causes of action. Arkin also had the nuisance claim that an association can never bring because particularized notice is required, particularized harm is required. The association couldn't bring those things. They raised the harm and the nuisance level and all the things the swans did, but they didn't have the particularized private nuisance claim. Arkin did. They weren't adequate to represent that either. Does this mean that the association can't prosecute anybody for any domestic animal because of the stipulation and settlement with the defendants? No. The consent judgment, as Arnett teaches, has to be very particularly read to its terms. And those are that the swans are, according to that consent judgment, the association accepts that the swans are consistent with the Paragraph 17 settlement, that the Lake Conservancy Group, they accept the consistency. So the association is bowing out. So if there were another family that had another set of swans, and these two swans started a feud because they're very possessive and territorial, kind of like Hatfield and Gweiss, that there would be no resolution other than a dead swan here or there because people couldn't litigate it? People could. The association could not. The association has said that if the West Lake Conservancy allows five families to have swans, so be it. That's consistent as we see it as an association. But it doesn't mean that the individual homeowners, all of whom have the right of this declaration and its protections, can't bring forward some action. Otherwise they'd have a right without a remedy, in essence, is what you're saying. There'd be no remedy. If, in fact, the association could in the two-month span give away that, that's correct, if that's what this held. And the other case, besides Arnett, that talks about this, is the Elliott Enterprises case that Justice Huston, you were asking about. That's that red case about where the landlord pursued it. And, again, they said the general rule, as you said, consent judgments can happen, but you have to go then to the particular wording. And then they limited the race judicata effect in that case. They said a couple of times, get to go on, because in a consent judgment it becomes like a contract analysis. It's the very precise and particular wording. And to ignore Judge McCoskey's deletion of those words and his putting in that he accepts their stipulation is to ignore the teaching of Arnett ahead of us, which says when parties agree to something and the court accepts it, that's not the same. Counsel, you'll have additional time on rebuttal. Thank you. Thank you, Justice. Mr. Stang. Good morning, Honorable Justices. Mr. Price, may it please the Court. The first thing I think I have to do is clear some of the dust that's been kicked up about the Arnett case. The Arnett case, and this was not addressed in the briefs, the argument was not made in the briefs, but is being made today about Arnett somehow precluding the application of race judicata here. Arnett was not a race judicata case. It's a collateral estoppel case. That's exactly what it says. The claims were brought by this individual. He was an asbestos-abated worker. The first claim was a worker's compensation claim against his employer. The claims that were the subject of the pending action were against a project manager and another contractor, an air sample professional. Most importantly, the opinion itself makes very clear, if you don't mind me reading this a bit, the preclusive effect of a settlement or consent judgment depends upon the circumstances. A consent judgment is entitled to race judicata effect, thereby barring re-litigation between the same parties or their privies for the same cause of action. So that's clearly the rule of law that governs in this case, and they cite the Elliott case. Why, if the first possessor of this client was a joint and somebody else stood in and if the proofs established this stood in as their privity or privies, why would that not be race judicata on this settlement, such that this particular appellant could claim that race judicata applies based upon the first judgment in these proceedings and move to vacate the second decision, which was not really a decision so much as a settlement order, and claim race judicata collateral estoppel, merely establish an agency relationship between the first and second parties possessing the swans, and then demand judgment thereon? Your Honor, I don't know. Hypothetically, that could be done. In the first case, it was filed with Mr. Arkin in 2006. He sued, I hope my memory is correct, at least half a dozen people. He non-suited five of them from the action and left his lawsuit pending only against Norbert Claussens and entered into an agreed order with Norbert Claussens, one person, not even Claussens' wife, who he also claimed had possessed and taken care of the swans. So it's conceivable that that would be probably a good argument for someone to attempt to make, to say everyone is bound by what Claussens agreed to or what his insurance company counsel agreed to. But that argument has not been raised by Mr. Arkin in any of this litigation. And so I think I do agree it's a good question. I just don't know the answer to it because we would have to get into a lot of facts regarding the relationship between Mr. Claussens and other individuals. By the way, Mr. Claussens was sued in the current action, he and his wife, and we have no indication they were ever served by any representative. So actually, they're not even parties to this appeal. Let me ask you this. One of the essential elements of Res Judicata is that the parties or their privies are identical in both actions. That requires an alignment of legal interests. Correct. There's a couple of factors I'd like you to focus on specifically. As I'm looking at the association's bylaws and the legal interest, specifically it's to promote cooperation among its members. That's its interest in enforcing paragraph 16. Arkin's interest is in enforcing an interpretation to prohibit the swans from what he perceived to be threats to his family's safety. So how are those interests aligned? Aren't they sort of fundamentally different? Cooperation among homeowners versus protecting somebody's property, isn't that a little bit different? I don't think they're so much different as complementary, Your Honor, because if you truly had a situation where one homeowner is threatening another homeowner's life or well-being or safety with some activity on his property or on the lake, which the lake waters are not owned by any one individual, the lake bottom lots are owned, I think that having people get along, promoting people getting along with each other for the sake of the community would be consistent with the association taking enforcement action against someone who's threatening really the public peace or safety. Mark's putting the higher priority of getting along versus protecting some individual homeowner's safety. Well, I don't think that any association could ever, or really any entity formed, whether governmental or private, for the sake to promote the interests and welfare of individuals could ever say, we have to let that person be at risk for the sake of harmony among the group. I wouldn't want to be part of any such association. But if the focus is fundamentally different, I mean, isn't there an issue to be raised whether they align? And further there, too, we have this e-mail. The settlement says it's designed to leave in a future dispute to be a personal one between individual homeowners. There's this e-mail that would indicate the board really viewed its interest as independent of Argus. That's from a single member of the board. And as we argued in our brief, there's nothing to indicate he had any authority to say that or had that communication. It's no different than what we often have all over Chicago. We probably have more governmental entities and boards and park districts and councils and so forth. And you sometimes have council members warring with each other, warring with each other with divergent interests between them. And sometimes they'll take a common action, and then they each have a rationale, either to the media or to the public, for why they've done what they've done. Summarize for us why you believe, what factors specifically support the argument that there is an alignment of legal interests. Okay. I'll take it right out of Mr. Arkin's reply. Page 2. For his part, Arkin rightly and properly turned to the RMHA to ask it to use its collective resources to enforce a declaration in bylaws. Further down it says he asked them to act. And by the way, he knew it was a lawsuit that he was insisting on, because I'm sorry I couldn't find it fast enough to take you through this voluminous declaration. The association doesn't have the ability to lien anyone's property for nonpayment of fees. They have private streets they have to maintain. If someone doesn't pay basically their assessments, they can be liened for that. There's nothing that would give the association the ability or power to assess a fine and then lien the fine against someone's resident. And, you know, by the way, he also said in that email, this is Mr. Arkin back in 07, he said, if the association would not act, then I have a lawyer, I'm paraphrasing now, I have a lawyer ready to go. And this is not paraphrasing, he said, once I start, I won't stop. So it's clear that he directed the association to do this. He put them under threat of litigation, that if they didn't file a lawsuit, he would take action. They filed a complaint. The complaint had Mr. Arkin's affidavit attached to it. And contrary to what is set forth in the reply brief, it says it was not incorporated. This was on page 17 of the reply brief. It was not incorporated into the amendment complaint. In fact, it was incorporated into the amendment complaint. And that's at page A183 of the appendix. It explicitly said attached is Arkin's affidavit and one of the persons, and it's incorporated here into the complaint. So it's obvious that Mr. Arkin himself viewed himself as having a commonality of interest with the association. He thought the association could adequately represent his interests. Now, that did come to a stop. I'm sorry, Justice Sotomayor. Well, I was about to ask, with respect, though, to the nuisance claim, that was in the 2008 suit. There was no nuisance claim in the 2007 suit. But we were instructed by the Illinois Supreme Court in the River Park case, and what we have to look at is do the causes of action in the two different lawsuits arise from a single set of operative facts, regardless of the form of the relief that's requested? And so the facts that he alleges in that count, too, the nuisance claim, and by the way, that's directed against only two defendants, not against the other 18. All the facts that he's got in there about claims of swans that harassed him, harassed his family, and by the way, his wife's not a plaintiff in this case. He's not here as a next friend of any minors, if there are minors, or any children. It's Mr. Arkin alone. The affidavit that's attached, and I can try to pull it out, but I don't want to slow things down. The affidavit that is attached to the amended complaint, and it's in the record, by Mr. Arkin, lays out classic nuisance allegations that the swans are harassing him, that they're interfering with his enjoyment of his property. That affidavit, as I just said, is adopted and incorporated into the amended complaint. So, in fact, it was part of the pleading. The particular form of relief that that's pled isn't controlling, because then parties could always use that to try to avoid or evade a race judicata effect. I think that's why the Supreme Court… The settlement agreement stipulated that the swans were deemed by the association to not be a nuisance? No, it did not say that. It said that it doesn't violate Section 16 of the… Let me just check. And does the clause give the Board the authority to litigate and enforce what might be deemed or termed a nuisance? The… Or is it entitled to enforce what is actually written? And if it is, is there a clause or an article regarding nuisances? Your Honor, here's where I had thought about another question about the 2006 lawsuit. This one I have not looked at. I would need to go through the bylaws to give an accurate answer, Your Honor. But I do want to say this. What the consent judgment does incorporate is the rules and regulations of the Westlake Conservancy. And that makes it clear that the swans not only are not a nuisance, they are designed… I'm sorry, not designed. Designed by God. But they're placed on the lake to get rid of what is indisputably a nuisance and viewed as such by almost everyone who lives on that lake besides Mr. Arkin and perhaps one other individual. And that is the goose problem that they have. I would urge you to read the rules and regulations. And it's in the record. It's clearly established by affidavit that there was goose feces all over that subdivision before they brought in the swans. Do you know what a scent gun is? I'm sorry, Your Honor? Do you know what a scent gun is? Scent gun? S-E-T-G-U-N. S-E-T-G-U-N. It's a gun that's a booby trap. It's placed in usually unoccupied houses. And if a trespasser, burglar, happens to trip it and gets blown away or maimed, that trespasser can bring a lawsuit against whoever set that scent gun up. And the rationale behind it is public policy says even though the burglar is a criminal, even though the burglar is a nuisance, and even though the burglar is a lot of things that we don't like, a scent gun isn't something that we accept. So my point to you is the fact that Canada geese are a greater problem doesn't mean that you can replace a greater problem with a different problem that may not be as great but is still a problem. So if these swans injure someone, are you telling us that there's no liability because the geese are worse? It would depend upon the circumstances of the injury. What I can represent to the court, and the record is consistent with this, is that the swans have never injured anyone in the Meadow Lake subdivision. Absolutely has never happened. Even Mr. Arkin's affidavit attesting to a complaint in the 2007 lawsuit does not allege that anyone was ever injured by the swans in that subdivision. And they've been there for 10 years, since 2000. I thought I read that a lawnmower was busted. Am I wrong? There's a claim that a lawnmower rolled into the lake as a result of, I believe... It was attacked by one of the swans. Well, I think startled by one of the swans, perhaps. The noise may have disturbed the swan from the slumber and caused the swan to become visibly annoyed. And I don't have personal knowledge, but yes, an allegation has been made that a lawnmower rolled into the lake. I thought we were talking about personal injury and bites or whatever. The point is a lawnmower loss is property damage, I would think, unless of course it's merely a toy. And even then it would be property damage. If we could depart for a second from the issue of the rogue swan, that's more to the point. I'm just curious, what happens today if one of the other 11 homeowners that were the subject of the earlier litigation decides to catch swans? And then they clearly become a threat to the safety of Mr. Arkin and his family. Decides to have swans around? Whoever... The swans are out there. Okay. So let's assume whatever, that they turn hostile and they begin to harass or attack and threaten the safety of Mr. Arkin and his family. What is his remedy then? Does he have a remedy? Well, objectively, I don't believe that... I suppose this would be a matter for experts who might disagree on. Swans cannot actually harm physically and bite. Their bills don't enable them to actually bite through flesh. So if something like that were to happen... Actually, you know what? I'm sorry. Just remember, the rules and regulations, which I should have read this morning, provide you can shoo away swans. You can't pin them. You can't leash them. You can't do anything that would actually mean keeping them on a lot. But you can shoo them away. So certainly, you know, if a swan, like a goose or any other animal, approached you, you shoo it away. But does he have any, arguably, does he have any legal remedy left here because of the raised butycata argument? To enjoin the swans being out there, the two swans? A legal remedy. Or is somebody going to throw up and wave the raised butycata document? I would say that just assuming without a personal injury of some kind, he would not have a legal remedy. His remedy would be that instead of saying, once I start, I won't stop, and burdening his neighbors and the courts with endless litigation, which raised butycata is designed to prevent, he start talking to his neighbors and try to work out a common solution. That certainly is open. I didn't finish my point on that case, but I just want to emphasize again. It's expressed and says, it talks about, that will stop in a different situation than raised butycata for the purpose of the document. Thank you, counsel. Mr. Price. Thank you. Just a few things in rebuttal to Mr. Stang. To your point, Justice McClaren, about the original agreed order with Mr. Clausen, it's precisely the point we're making here. It's an agreement between the two parties, and it's raised butycata as to Mr. Clausen and anybody in privity with him. But he was not an adequate representative of the other people in Meadow Lake. We recognize that, and that's why we've not tried to assert that. And it's exactly the same teaching we're insisting on here, that the association did what Arkin did. They have an agreement as to themselves, but it's not sufficient to do that. As to the point about other remedies, Mr. Stang overlooks the bylaws, which says, concerning the duties and powers of the board of directors of the association, that they have the duty and the power to determine whether the conduct of any member is detrimental to the welfare of the association and to fix the penalty for such misconduct or any violation of the bylaws or rules. That's where they get the power to lay fines, and that's what they could have done. But they chose to litigate after much independent decision-making. And, yes, we are talking about enforcing paragraph 16, but for different reasons. Rube Morton was careful to keep saying, we're trying to make people get along, and Arkin's talked about protecting his family. And attached to the 2006 lawsuit that is made a part of the record, I'm sorry, attached to the 2007 lawsuit of the RMHA are two affidavits, one of Arkin and one of Rabbi Oler. And Rabbi Oler's affidavit, which is in the record, talks about the Swans attacking him and biting his children. So that is in the record. The attack of the Swans, so to speak, is in the record. And those two affidavits, while attached to the complaint in some unusual pleading, were not incorporated in the complaint. And so to the nuisance point, they weren't incorporated. They weren't done. They were simply put in as a point of interest that does get this ball rolling, in all fairness, on this race-judy kind of thing, that they're pursuing the same interests to your point, Justice Zimmerman, that paragraph 16 and the harm that's going on with these Swans, yes, those things are in parallel between the Association and Arkin. But that doesn't make the Association an adequate representative of Arkin at the end of the day. And one of the places that Mr. Standing has taken us off the path a little bit is the affirmative matters are critical. In the opinion, the Rockford case, Justice McLaren, that you were on, you guys cited the Peregrine case. And in the Peregrine case, the transaction test looked at the original affirmative defenses that the court ruled against. Now, it was ruled against for pleading requirements, that they were untimely and they were brought late, and the court dismissed them. But you looked at Peregrine, and Peregrine picks up all the affirmative matters. And in her ruling, Judge Mullen said, no, that is not the law. The affirmative matters don't matter. Have you sought any case law relating to settlements in lieu of judgment? And the enforcement thereof, I believe, relates to not race-judicata collateral estoppel. It relates to interpretation of a contract or, put another way, settlement agreements. Settlement agreements are reviewed as contracts under contract law. And I don't believe terminologies like collateral estoppel apply to settlement agreements. Contract law applies as to whether there's an ambiguity or whether or not this clause or the intent of the parties intended that this be there or not be there, and so on and so forth. I think you're subliminally quoting Arnett. That's exactly what it says, that these consent agreements get treated like contracts. That's exactly what that whole thing says, and so does Elliott, and so does Wilson, and so does Karnas, that we have to go and look at the precise wording and we interpret them, according to Arnett, like a contract. Exactly what those cases said. Karnas and Wilson were cited by us, and Arnett, which he doesn't like, was cited by him. That's the defendant's primary case on this whole rule about what a consent judgment can or can't do for you. And so you have to take the good with the bad on the teaching about consent judgments, and the good and the bad is there's a logical distinction when they're done as an agreement between the parties, and that's what McCoskey said he did. He accepted their agreement, a stipulation, and it then further says we're reluctant to move it beyond the two parties. There can't be a double recovery that way. There can't be inconsistent judgments that way, but between those two parties, it's ready to be covered, but not so for other people because we've never had it on the merits. Thank you. Thank you very much, counsel. At this time, the court will take the matter under advisement and render a decision in due course. Thank you very much.